Richardson, Ch. J.,
delivered the opinion of the court:
The claimant was appointed and commissioned envoy extraordinary and minister plenipotentiary to Corea February .27,1883, accepted the office, and immediately entered upon its duties. He has been paid at the rate of $5,000 a year from that date to May 7,1885.
*448 He claims that be held that office until tbe latter date and became entitled to a salary of $10,000 a year under the provisions of the Revised 'Statutes, section 1675, as amended by the Act of March 3, 1875, chapter 153 (Supp. to Rev. Stat., 188), as follows:
“Sec. 1675. Embassadors and envoys extraordinary and ministers plenipotentiary shall be entitled to compensation at the rates following, per annum, namely:
Great Britain, and Russia, each seventeen thousand five hundred dollars.
Italy, Japan, Mexico, and Spain, each, twelve thousand dollars.
countries, unless where a different compensation is prescribed by law, each, ten thousand dollars.”
To overcome the express provision of the last-quoted clause of that section, which prescribes a salary of $10,000 a year to envoys extraordinary and ministers plenipotentiary to all other countries than those named, and Corea was not of those named, the defendants rely upon the circumstances of the claimant’s appointment, the action of the Secretary of State, and the appropriation made by Congress.
Congress neither established nor recognized the office of envoy extraordinary and minister plenipotentiary to Corea, nor made any express appropriation to maintain it.
The annual appropriation Act of February 26, 1883, chapter 56 (22 Stat. L., 424, 431), for the year ending June 30, 1884, contained the following:
“ Sec. 2. For the purpose of enabling the President to extend diplomatic relations with the Government of Eastern Asia, five thousand dollars.”
The claimant was immediately nominated as envoy extraordinary and minister plenipotentiary to Corea, the Senate consented thereto, and he was the next day so commissioned.
There seems to be no connection between the appropriation and the claimant’s appointment except that the appropriation indicated a desire on the part of Congress to extend diplomatic relations with Eastern Asia, and the Secretary of State, in his first letter to the claimant, refers to it as the reason which has induced the President to make the appointment. Corea was not named in the act and the money appropriated was not available until the succeeding fiscal year, commencing July 1, 1883, four months after his appointment.
*449 The President appears to have acted upon the prerogative claimed for tbe Executive under the Constitution, Article II, Section 2, that “he shall nominate, and by and with the advice and consent of the Senate shall appoint embassadors, other public ministers and consuls,” independently of any authority from Congress. This general claim of Constitutional prerogative by the Executive we considered in the case of Byers (22 C. Cls. R., 59), where authorities are cited, and little remains to be added.
The course of legislation has generally been in accord with the interpretation claimed for the Executive. We have found but few statute provisions in which Congress appears to have directly dictated as to the establishment of diplomatic offices.
These are found in the following sections of the Revised Statutes. Section 1682 (first enacted in 1872,17 Stat. L., 142) provides that “That there shall be but one minister resident accredited to Guatemala, Costa Rica, Honduras, Salvador, and Nicaragua.” Section 1613 provides that “There shall be a diplomatic representative of the United States to each of the Republics of Hayti and Liberia.” This section was first enacted in 1862, June 5, chapter 96 (12 Stat. L., 421), where the President was “authorized,” not required, to appoint. The title of the office was changed by Act of 1866, July 25, chapter 233 (14 Stat. L., 225). The Act of July 7,1884, chapter 333 (23 Stat. L., 228), provided that “The minister resident and consul-general at Hayti shall also be accredited as chargé d’affaires to Santo Domingo.”
With those exceptions Congress has either appropriated a ■sum in gross “for the expenses of intercourse with foreign nations,” leaving the establishment of both the offices and the salaries to the Executive, as in the early years of the Government pointed out iu Byers’s Case; or, as now, by Revised Statutes, section 1675, fixing the salaries for all the diplomatic officers actually existing and establishing rates for all others, thus apparently conceding power in the Executive to make diplomatic appointments other than those expressly recognized by Congress.
Perhaps these recent exceptions may be interpreted only as indicating the offices that Congress was willing to appropriate salaries for, and not as interfering with the constitutional rights claimed for the President.
*450 The validity of the claimant’s appointment was, however, not controverted at the trial, and we refer to the matter as conclusively showing that it was not dependent upon the act appropriating $5,000 for the purpose of enabling the President to-extend diplomatic relations with eastern Asia.
In the letter of instructions given to the claimant (finding 2) he was informed that his salary would be at the rate of $5,000 a year, and he was paid at that rate throughout his official term. This was clearly erroneous. Neither the Secretary of State nor the President had authority to fix the salary of an envoy extraordinary and minister plenipotentiary. This was established by lievised Statutes, section 1675, which enacts that the salaries of “those to all other countries [among which Corea must be classed], unless where a different provision is prescribed by law, each, $10,000.”
No different provision for the claimant’s office was prescribed'' by law. The appropriation to extend diplomatic relations with eastern Asia, as we have shown, did not take effect until four months after his appointment. Corea was not specifically named therein, and the money was not required to be applied to the salary of a diplomatic officer. The President might have used the money in any way he saw fit to extend diplomatic relations with any of the eastern nations. That it was applied towards the payment of one-half a year’s salary of the claimant, as established by law, does not prevent recovery of the other half. Nor does the payment out of the contingent fund of one half of the established salary from February 27 to June 30,1883, affect his right to the other half.
The claimant is therefore entitled to recover the unpaid balance of his salary of $10,000 a year so long as he was envoy extraordinary and minister plenipotentiary. That brings us to the question, When did he cease to hold that office?
He was appointed without Congressional action, and held his position at the will of the President. When, by the Act of July 7,1884, chapter 333 (23 Stat. L., 228), Congress made an appropriation of $5,000 for the salary of a minister, resident and consul-general at Corea, the President immediately took steps to-mate the diplomatic mission to Corea conform to the apparent wishes of Congress, and nominated and, by and with the advice and consent of the Senate, appointed the claimant as minister resident and consul-general. A commission for the new *451 offices was sent to the claimant, and reached Mm about the 15th of September, 1884.
This was clearly the exercise of the President’s will to discontinue the office of envoy extraordinary and minister plenipotentiary and to recall the claimant from that office, and it took effect, under the circumstances, upon the tender and receipt of the new commission for a different office, with instructions accompanying it. The claimant declined the new appointment tendered him, and never qualified by taking the oath and giving bond as required by law.
In his letter to the Secretary of State, explaining the reasons for that determination, he said :
'•‘My present status is somewhat anomalous, but, believing that there must be some provision for such cases or some precedent to govern them, I shall continue to exercise the functions of the position until further advised. (Finding 3.) ”
When this letter reached the State Department the Secretary wrote to him to take a leave of absence and come to this country, which he did. He never returned to Corea, and his resignation was finally accepted March 25,1885’
The words of his letter imply that he was aware that he ceased!, to hold the office of envoy extraordinary and minister plenipotentiary. In connection with the facts that the Executive had provided another office to supersede that which he had held,, that Congress had appropriated a salary for it, and that he had been offered the new position and declined it, we must give to-those words the interpretation, not that he intended to continue to hold an office which the President had discontinued, but that', his purpose was to continue to exercise the functions of the position of minister resident and consul-general as an officer d& facto. We think it was so understood both by him and by the' Executive. This view is strengthened by the fact that, in his last account for salary settled at the Department, he styles himself “late minister and consul-general,” and in accepting his resignation the Secretary of State styles him “late minister.” But whether so intended or not the facts must control, and they lead to the same result.
To hold that he ceased to be envoy extraordinary and minister plenipotentiary upon receipt of the notice of the change in the charactei of the mission gives effect to the will of .the President and the wishes of Congress and does justice to the claimant and to the defendants.
*452 After September 17, 1884, until the acceptance of Ms resignation, he was, at most, merely a defacto minister resident and consul-general nominally holding the office, taking leave of absence, and, so far as it appears, performing no official acts and exercising no duties, and for that time he has been paid the full salary of the office. The most favorable result for him that can be reached upon his claim for compensation during that period is that he may retain what he has received. (Miller’s Case, 19 C. Cls. R., 353; Palen’s Case, 19 C. Cls. R., 394.)
For the previous time, while he was envoy extraordinary and minister plenipotentiary, he has been paid only one-half the salary established by law for that office, and he is now entitled to judgment for the other half, amounting to $7,760.27. This point in the case is ruled by Langston’s Case (21 C. Cls. R., 10, affirmed on appeal 118 U. S. E., 389), wherein it was held that where Congress failed to appropriate a sum sufficient to pay the full salary fixed by statute for the office held by him and he had received only what had been appropriated, he was entitled to judgment for the unpaid balance. In the present case Congress has made no direct appropriation whatever for the salary established by law for the office held by the claimant, but • he has received out of the public Treasury in some other way one-half the amount due him, leaving still unpaid the sum for which the court gives him judgment.
Davis, J., did not sit at the hearing of this case, and took no oart in the decision.